FILED
2023 Jan-10  AM 09:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| ERIC DASHON PETERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:21-cv-00654-KOB-NAD |
| | ) | |
| RAVEN BROOKS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Eric Dashon Peterson filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging violations of his civil rights while incarcerated at the Bibb Correctional Facility.[1]  Doc. 1.  Plaintiff Peterson names as Defendants Officers Raven Brooks and Jonathan Williams.  Doc. 1 at 3.

Peterson alleges that Defendants Brooks and Williams violated his Eighth Amendment rights by failing to protect him and failing to intervene when Peterson was threatened and attacked by other inmates.  Doc. 1 at 2–7.  Peterson seeks money damages.  Doc. 1 at 7, 11–12.

Consistent with the usual practices of this court and 28 U.S.C. § 636(b)(1), this matter was referred to the undersigned for a preliminary report and recommendation.  *See McCarthy v. Bronson*, 500 U.S. 136 (1991); N.D. Ala. Local

---

[1] Peterson since has been released from custody.  *See* Doc. 33.

Rule 72.1.  For the reasons stated below, the court should grant in part and deny in part Defendants' motion for summary judgment (Doc. 29).  In particular, the undersigned recommends that the court grant Defendants' summary judgment motion on Peterson's failure to protect claim, and deny Defendants' summary judgment motion on Peterson's failure to intervene claim.

## BACKGROUND

### A.    Factual background

#### 1.    Facts according to Plaintiff Peterson's sworn complaint and reply

Peterson alleges the following facts:  On the morning of February 5, 2021, Peterson was attacked by other inmates.  Doc. 1 at 4–5; Doc. 32 at 2.  That morning, Defendant Officer Raven Brooks entered the dorm where Peterson was housed to perform a bed roster check.  Doc. 1 at 4–5; Doc. 32 at 4.  In violation of Alabama Department of Corrections regulations, Brooks had long hair, eyelash extensions, painted nails, and was wearing perfume.  Doc. 1 at 4–5; Doc. 32 at 3–4.  While other inmates were "wowed" by Brooks' appearance, Peterson stated, "elephant in the room."  Doc. 1 at 5; Doc. 32 at 4.  Inmate Trimez Usher[2] then threatened Peterson "about 15 times accompanied with [g]estures of violence" while Brooks was present.  Doc. 1 at 4–5.  Inmate Usher repeatedly stated that, when Brooks left the dorm, he

_____

[2] While Peterson refers to this inmate as "Usher Trimez" (*see, e.g.*, Doc. 1 at 4), prison records reflect that his name is "Trimez Usher" (*see, e.g.*, Doc. 29-1 at 1).

was "going to slap the f[***] out of [Peterson]."  Doc. 1 at 5.  Brooks heard these threats but took no action "to change the tide."  Doc. 1 at 4–5.  Peterson admits that Brooks did tell Usher that harming another inmate could result in Usher's being placed in segregation, but avers that Brooks did not remove any of the inmates for safety.  Doc. 32 at 9, 17.

Between 6 and 10 inmates—including Travis Griffin, but not Usher—assaulted Peterson from behind and punched him twice in the face; the inmate assault also included punching, slapping, kicking, and stomping (before Peterson could escape), and Peterson sustained non-life-threatening injuries.  Doc. 1 at 4–5; Doc. 32 at 3–5.  Peterson was assaulted/attacked twice before Officer Williams used mace to stop a third assault.  Doc. 1 at 4–5; Doc. 32 at 3, 16.

Usher had a knife or shank which was over 20 inches long.  Doc. 32 at 3.  But Usher did not stab Peterson.  Instead, video evidence shows that Usher never made physical contact with anyone; inmate Griffin hit Peterson first, and then 5 or 6 other inmates assaulted him.[3]  Doc. 32 at 4–6, 11.  Usher "was handed a knife/shank by Hall Runner Pruit, therefore [Peterson] kept [his] distance from him and was struck from behind by Travis Griffin."  Doc. 32 at 4–5.

---

[3] Peterson relies heavily on video evidence in both his complaint and his response (Doc. 1; Doc. 32), but no video has been produced to the court.  Peterson asserts that the relevant footage is between 9:20 AM and 10:00 AM on February 5, 2021.  Doc. 32 at 11.

Brooks and Defendant Officer Jonathan Williams—who had arrived on the scene—did not take any action to stop the beating until after Peterson had been assaulted twice and the third assault was imminent; Williams then used his mace to stop the assault. Doc. 1 at 5, 11; Doc. 32 at 3. Video evidence shows that Brooks waited until Williams used his mace to call a "Code Blue" for assistance. Doc. 32 at 2–3. According to Peterson, both Brooks and Williams "just watched" while Peterson was attacked twice and did not give any orders for the inmates to stop before Williams used his mace to stop a third attack. Doc. 32 at 4–6, 11, 15–16. Both Brooks and Williams could have intervened sooner, which would have prevented Peterson's injuries. Doc. 1 at 6, 11; Doc. 32 at 2.

Brooks later stated in front of other inmates that she did not stop the assault because she wanted to see Peterson "get [his] a[**] beat." Doc. 1 at 5; Doc. 14 at 1; Doc. 32 at 11. Brooks followed Peterson to the medical unit and told non-party Captain Smith that she did not see anyone "jump [Peterson] or threaten" him. Doc. 1 at 5; Doc. 14 at 2.

As a result of the assault, Peterson sustained a busted lip, blood in his right nostril, and injuries to his right eye, left knee, ribs, right shoulder, jaw, and legs.[4] Doc. 1 at 5, 11–12; Doc. 32 at 5–6. Peterson received inadequate medical attention

---

[4] Peterson included sick call records with his complaint. Doc. 1 at 8–9.

for his injuries.[5]  Doc. 1 at 6; Doc. 14 at 2; Doc. 32 at 5–6.

Peterson received a disciplinary write up for fighting without a weapon, but the warden later overturned the disciplinary action because video evidence showed that Peterson acted in self-defense.  Doc. 1 at 6–7; Doc. 14 at 2.

### 2.   Facts according to Defendant Brooks' and Defendant Williams' sworn responses

Defendants dispute many of Peterson's allegations.  In a sworn declaration, Officer Brooks avers the following:  On February 5, 2021, Brooks was conducting a bed roster check with Officer Williams, and a "scuffle unexpectedly occurred" among Peterson, Usher, and a third inmate (Griffin).  Doc. 29-2 at 1.  Brooks heard Peterson say "something like 'elephant in the room,'" but she did not know that Peterson's comment had anything to do with her.  Doc. 29-2 at 1.  Brooks heard inmate Usher say that he was going to slap Peterson, but she "did not think and had no reason to think inmate Trimez [Usher] was actually going to slap Peterson."  Doc. 29-2 at 2.  Usher's comment about slapping was made "casually only around two times" and was not accompanied by gestures of violence.  Doc. 29-2 at 2.  Nevertheless, Brooks "did try to deescalate any kind of potential issue between them by counseling" Usher not to slap Peterson because it was "not worth it" and because

---

[5] While Peterson alleges deficiencies in the healthcare that he received for his injuries (Doc. 1; Doc. 14 at 2; Doc. 32 at 27–47), he does not name as a defendant any individual who could have had any responsibility for his medical treatment, nor is any such individual apparent from his pleadings.

"[Usher] would go to seg."  Doc. 29-2 at 2.

Peterson "did not appear concerned by inmate Trimez['s] comment and calmly threatened Trimez," which upset Usher and caused Peterson and Usher to "start bickering" and "threatening each other."  Doc. 29-2 at 2.  "[A]t no time did [Brooks] understand or have any reason to believe that the bickering between inmate Peterson and inmate Trimez related to [her]."  Doc. 29-2 at 2.  Brooks "took action to prevent or stop the unexpected scuffle" by telling Peterson and Usher to "stop bickering," and by telling Usher that it would not be worth it for him to follow up on his threat.  Doc. 29-2 at 3.

When the fight among the inmates began, Brooks ordered them to stop.  Doc. 29-2 at 3.  When the inmates ignored the order and did not stop fighting, Brooks "called for a code blue for assistance and Officer Williams pulled out his chemical agent to gain control of the situation" because it looked like Peterson had "unexpectedly pulled out a shank."  Doc. 29-2 at 3.

"[I]nmates can be overheard bickering between each other daily at the prison," but that "does not mean there is going to be a fight."  Doc. 29-2 at 3.  In addition, Peterson's allegations about Brooks' appearance were false, Brooks did not "stand by and allow inmate Peterson to be assaulted," and she did not say that she was not going to stop the fight, or that she wanted Peterson to be beaten.  Doc. 29-2 at 3.

In a sworn affidavit, Officer Williams avers as follows:  While conducting

bed roster check, he observed inmates Usher and Griffin "involved in a physical altercation with" Peterson. Doc. 29-3 at 1. Williams "ordered all of the inmates to stop fighting" and, when they failed to do so, "pulled [his] chemical agent and sprayed each inmate in the facial area." Doc. 29-3 at 1. "[A]t no time" did Williams "stand by" and allow Peterson to be assaulted. Doc. 29-3 at 1.

### 3. Other record facts

An incident report from February 5, 2021, composed by non-party Sergeant Barbara Davis indicates that, around 9:25 AM, inmates Peterson, Usher, and Griffin were involved in an incident of inmate-on-inmate fighting without a weapon. Doc. 29-1 at 1. The incident report states that Officer Williams told the inmates to stop fighting and then discharged his mace, and that Officer Brooks called a "Code Blue" for assistance. Doc. 29-1 at 1. Other officers arrived on the scene and restrained the inmates, and Peterson was escorted to the infirmary for an assessment. Doc. 29-1 at 1. When asked why they had been fighting, Peterson said that it was because he had disrespected Brooks during bed roster check. Doc. 29-1 at 1.

A body chart shows that, on February 5, 2021, Peterson sustained a busted lip, a scratched arm, dried blood in his nostril, and a sore hip. Doc. 29-1 at 3.

Peterson submitted an inmate statement, indicating that he "was mistaken to be angry with Officer Brooks due to [a] disciplinary" write up from December 2020, and that he spoke to Brooks about it during bed roster check, which caused another

inmate to threaten to slap him.  Doc. 29-1 at 4.  Peterson stated that he then was "hit in the face from behind" by an unknown inmate and tackled, though he then stated that the incident was due to "tension and misguided aggression" and that he was "fine!".  Doc. 29-1 at 4.  Usher also submitted a statement, in which he stated that Peterson disrespected Brooks, that Usher told Peterson to stop being disrespectful, and that the situation escalated because Peterson "pull[ed] out a knife."  Doc. 29-1 at 8.

An investigative report found Williams' use of force—spraying the inmates with mace when they would not stop fighting—to be "reasonable, necessary and justified."   Doc. 29-1 at 9.   Peterson initially received a disciplinary write up regarding  the  incident  (Doc.  29-1  at  10–12),  but  the  warden  overruled  the disciplinary action because video footage showed that Peterson acted in self-defense (Doc. 29-1 at 13).

### B.    Procedural background

In response to an order for special report (Doc. 13), Defendants Brooks and Williams filed a special report, which they supported with affidavits and exhibits. Doc. 29.

On March 10, 2022, the parties were notified that the court would construe the special report as a motion for summary judgment, and Peterson was notified that he had the right to respond to the summary judgment motion by filing affidavits or

other evidence. Doc. 31.  Peterson also was advised of the consequences of any failure to respond or comply with Federal Rule of Civil Procedure 56.  Doc. 31; *see Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).  On April 6, 2022, Peterson filed a response.[6]  Doc. 32.

### C.   Legal background

#### 1.   Eighth Amendment

The Eighth Amendment, made applicable to the states by the Fourteenth Amendment, "imposes a duty on prison officials" to "take reasonable measures to guarantee the safety of the inmates." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)) (alterations omitted).  This includes a duty to protect prisoners from violence by other prisoners. *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1319–20 (11th Cir. 2016).  But not every instance of inmate-on-inmate violence means constitutional liability for prison officials. *Terry v. Bailey*, 376 F. App'x 894, 895 (11th Cir. 2010) (quoting *Farmer*, 511 U.S. at 833–34).

"[A] prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment if the official is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Marbury v. Warden*, 936 F.3d

---

[6] Peterson captioned his response "Initial Disclosures," but responded to the special report.  Doc. 32.

1227, 1233 (11th Cir. 2019) (citations and quotation marks omitted). In this regard, a prison official violates the Eighth Amendment "when a substantial risk of serious harm, *of which the official is subjectively aware*, exists and the official does not respond reasonably to the risk." *Caldwell*, 748 F.3d at 1099 (quoting *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003)) (emphasis in original).

### 2. Qualified immunity

Qualified immunity provides "complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (quotation marks omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014) (quoting *Lane v. Franks*, 573 U.S. 228, 243 (2014)). In order to receive the protection of qualified immunity, a government official first must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).

To overcome qualified immunity, a plaintiff then must show (1) that the officials violated a constitutional right, and (2) that the right was clearly established at the time of the alleged violation. *Marbury*, 936 F.3d at 1232. A court may address

these two prongs "in either order."  *Waldron v. Spicher*, 954 F.3d 1297, 1304 (11th Cir. 2020).

For a right to be clearly established, a plaintiff can either identify case precedents with materially similar facts or show that the violation was so obvious that every reasonable officer would know that his actions were unconstitutional.  *Corbitt v. Vickers*, 929 F.3d 1304, 1311–12 (11th Cir. 2019).  In other words, the law must give the officer "fair warning" that his conduct is unconstitutional.  *Piazza v. Jefferson Cty., Ala.*, 923 F.3d 947, 955 (11th Cir. 2019) (citations omitted).  In analyzing qualified immunity, courts focus not only on the state of the law, but on the factual information that the defendant possessed at the time of the alleged violation.  *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (stating that the qualified immunity analysis "will often require examination of the information possessed by" the defendant officials).

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A material fact is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond the allegations to offer specific facts that create a genuine dispute for trial. *Celotex*, 477 U.S. at 324–25. The court's job is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must construe all evidence and draw all reasonable inferences in favor of the nonmovant. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).

In addition, on a defendant's summary judgment motion, the court must consider any "specific facts" that a *pro se* plaintiff pleaded in his sworn complaint. *See Caldwell*, 748 F.3d at 1098 (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). The court liberally construes a *pro se* pleading. *See, e.g.*, *Jones v. Florida Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015) (the court should hold a *pro se* pleading to "a less stringent standard than a pleading drafted by an attorney").

Furthermore, the practical reality that a plaintiff's "evidence consists mainly of his own testimony in his verified complaint, sworn response, and sworn affidavit does not preclude a finding that a genuine dispute of material fact exists." *Sears v.*

*Roberts*, 922 F.3d 1199, 1208 (11th Cir. 2019).  And, "[e]ven if his sworn statements turn out to be exaggerations or false, they are enough to raise a genuine issue of material fact" for trial.  *Id.* at 1209.  On a summary judgment motion, a court cannot make credibility determinations.  *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006).

## DISCUSSION

Based on Plaintiff Peterson's sworn allegations, the undersigned construes Peterson's complaint as asserting claims against Defendants Brooks and Williams[7] for failure to protect and failure to intervene, in violation of the Eighth Amendment.[8]

---

[7] It appears that Peterson brings his claims against Brooks and Williams in their individual capacities.  Peterson cannot state a claim against Brooks and Williams in their official capacities because sovereign immunity would bar any such official capacity claim, as Brooks and Williams are employees of the Alabama Department of Corrections and thus agents of the state.  *See Pennhurst State Sch. & Hosp. v Halderman*, 465 U.S. 89, 100 (1984); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (a suit against a state official in his official capacity is a suit against the state itself); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (the Eleventh Amendment prohibits a suit against the state absent the state's consent to the suit).  Consequently, the court should construe Peterson's claims as alleged against Brooks and Williams only in their individual capacities.  *See generally Chandler v. Vansuch*, 2022 WL 1721220, at *2–3 (N.D. Fla April 6, 2022) (discussing that regardless of pro se prisoner's specification of the capacity in which suit is brought, a court must consider the appropriate capacity).

[8] While his response also invokes the Equal Protection Clause under the Fifth and Fourteenth Amendments (Doc. 32 at 12), Peterson may not bring a new claim in a response to a special report (construed as a summary judgment motion).  And, in any event, Peterson does not allege that he was treated differently from similarly situated inmates, and so any equal protection claim would fail anyway.  *See Sweet v. Secretary Dep't of Corr.*, 467 F.3d 1311, 1318–19 (11th Cir. 2006) ("To establish an equal protection claim, a prisoner must demonstrate that (1) he is similarly

On Defendants' summary judgment motion, the court should grant with respect to Peterson's failure to protect claim, and deny with respect to his failure to intervene claim.

## I. On Peterson's failure to protect claim, the court should grant Defendants' summary judgment motion.

On Peterson's failure to protect claim, the court should grant Defendants' summary judgment motion because there is no genuine dispute of material fact for trial. As noted above, the Eighth Amendment imposes on prison officials a general duty to protect prisoners from violence by other prisoners. *Bowen*, 826 F.3d at 1319–20. To avoid summary judgment on a failure to protect claim, a plaintiff must produce evidence to satisfy three elements. *Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021). First, he must show that he was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 1358. Second, the plaintiff must show that the defendant prison official had a "sufficiently culpable state of mind" rising to the level of "deliberate indifference." *Id.* Third, the plaintiff must demonstrate causation—i.e., that the constitutional violation caused his injuries. *Id.*

On the first element (that is, a "substantial risk of serious harm"), a plaintiff must show extreme conditions that "posed an unreasonable risk of serious injury to

_____

situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis.").

his future health or safety." *Marbury*, 936 F.3d at 1233.  In considering this first element, the court uses an objective standard.  *Caldwell*, 748 F.3d at 1099.

The second element—that is, deliberate indifference—requires that "the defendant actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm and that the defendant disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner."  *Mosley v. Zachery*, 966 F.3d 1265, 1270–71 (11th Cir. 2020) (alterations in original).

At a minimum, a prisoner must show that a defendant subjectively was aware of facts from which the defendant could have inferred that there was a substantial risk of serious harm, and that the defendant actually drew the inference; and, "[o]bjectively, the official must have responded to the known risk in an unreasonable manner," by knowingly or recklessly declining to reduce that risk, despite knowledge regarding how to do so.  *Marbury*, 936 F.3d at 1233.

Then, on the third element (i.e., causation), a plaintiff must show a "causal link" between a defendant's "failure to act reasonably and the plaintiff's injury."  *Id.*

Furthermore, "deliberate indifference describes a state of mind more blameworthy than negligence," and an "ordinary lack of due care for the prisoner's interest or safety" will not support an Eighth Amendment claim.  *Farmer*, 511 U.S. at 835.  A "[m]erely negligent failure to protect an inmate from attack does not justify liability under § 1983."  *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th

15

Cir. 2013) (quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990)).

Importantly, according to the Eleventh Circuit, "[t]he unfortunate reality is that threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Marbury*, 936 F.3d at 1236 (quotation marks omitted). Rather, prison officials must possess enough details about a threat to enable them to conclude that it presents a "strong likelihood" of injury, not a "mere possibility." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015) (quoting *Brown*, 894 F.2d at 1537).

Moreover, a defendant can avoid liability under the Eighth Amendment where the defendant can show that he "did not know of the underlying facts indicating a sufficiently substantial danger" and was "therefore unaware of a danger," or that he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent," or that he "responded reasonably to the risk, even if the harm ultimately was not averted." *Rodriguez v. Secretary for Dep't of Corr.*, 508 F.3d 611, 617–18 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 844).

Here, Peterson cannot create a genuine dispute of material fact for trial because he cannot show that either Brooks or Williams actually, subjectively knew that Peterson faced a substantial risk of serious harm, and that either Defendant disregarded that known risk by failing to respond in an objectively reasonable

manner.  *See Mosley*, 966 F.3d at 1270–71; *Marbury*, 936 F.3d at 1232; *Waldron*, 954 F.3d at 1304.

With respect to Defendant Brooks (and as explained above), Peterson avers that Brooks heard Usher's threats to Peterson, should have known that Peterson was in danger, and yet did nothing to prevent Peterson's assault.  Doc. 32 at 9.  In turn, Brooks admits that she heard Usher threaten Peterson, but avers that she did not believe the threats amounted to anything more than "bickering" because inmates trading threats is commonplace.  Doc. 29-2 at 3.  Even accepting as true Peterson's averments and drawing all reasonable inferences in his favor, Peterson cannot make the required showing that Brooks subjectively knew that Peterson faced a substantial risk of serious harm.  *See Mosley*, 966 F.3d at 1270–71.  Peterson alleges that, before he was assaulted, Usher threatened to "slap the f[***] out of [Peterson]" multiple times and made gestures of violence.  Doc. 1 at 4–5.  But threats between inmates are common and do not always serve to impute knowledge of a substantial risk of serious harm.  *See Marbury*, 936 F.3d at 1236.  There is no evidence or averment that Usher threatened harm more serious than slapping, that any inmate other than Usher threatened Peterson, or that Usher had threatened Peterson at any time other than during the bed roster check.

In addition, Brooks avers—and Peterson does not dispute—that "inmates can be overheard bickering between each other daily at the prison," and that "does not

mean there is going to be a fight." Doc. 29-2 at 3. Thus, on the record evidence, Usher's threats did not present a "strong likelihood" of serious injury, as opposed to a "mere possibility." *See Brooks*, 800 F.3d at 1301.

Furthermore, Brooks specifically avers in her sworn declaration that she "did not think and had no reason to think inmate Trimez [Usher] was actually going to slap Peterson." Doc. 29-2 at 2. Peterson does not dispute this fact; instead, Peterson suggests in his response that the attack could have been avoided "had Officer Raven Brooks taken Usher Trimez's threats just as they were, 'Serious!'." Doc. 32 at 2. Peterson appears to admit that Brooks did not actually think that Usher's threats raised a substantial risk of serious harm. *See Mosley*, 966 F.3d at 1270–71. And it is undisputed that Brooks attempted to avoid any conflict between Peterson and Usher by telling Usher that harming another inmate could result in his being placed in segregation. *See* Doc. 32 at 9, 17.

At most, Peterson has identified an alleged negligent failure to protect (*see* Doc. 32 at 6, 8, 18), which does not amount to a constitutional violation. *See Goodman*, 718 F.3d at 1332. Because the record evidence shows that Brooks subjectively "believed"—even if "unsoundly"—that "the risk to which the facts gave rise was insubstantial or nonexistent," Peterson cannot show that Brooks was deliberately indifferent on his failure to protect claim. *See Rodriguez*, 508 F.3d at 617–18.

Likewise, with respect to Defendant Williams, the court should grant summary judgment on Peterson's failure to protect claim. When assessing deliberate indifference under the Eighth Amendment, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Peterson avers that Williams violated his rights because Williams did not give orders to stop fighting and waited too long to use his mace to intervene in Peterson's assault by other inmates. Doc. 1 at 5, 11; Doc. 32 at 3–4. Williams in turn asserts that he saw the inmates fighting and acted to stop it. Doc. 29-3 at 1.

There is no record evidence that Williams heard Usher's threats or otherwise knew of any risk to Peterson before the alleged assaults, or that Williams failed to protect Peterson from any such risk. Peterson includes no averments that Williams heard the threats (*see generally* Doc. 1; Doc. 14; Doc. 32), and Williams' affidavit includes no information about any threats to Peterson (*see* Doc. 29-3 at 1). Peterson avers that only Brooks was present, and that only Brooks heard Usher's threats. *See generally* Doc. 1; Doc. 14; Doc. 32.

Accordingly, nothing in the record shows that Williams subjectively knew that Peterson faced any risk of harm, or that Williams was deliberately indifferent to any such risk. *See Cox*, 15 F.4th at 1358; *Mosley*, 966 F.3d at 1270–71. Consequently, there is no triable issue for a jury on Peterson's failure to protect claim

against Williams.  *See Rodriguez*, 508 F.3d at 617–18.[9]

## II.     On Peterson's failure to intervene claim, the court should deny Defendants' summary judgment motion.

On Peterson's failure to intervene claim, the court should deny Defendants' summary judgment motion because there is a genuine dispute of material fact for trial.   As explained above, Peterson avers that Brooks violated his Eighth Amendment rights by failing to take action to stop the assaults and waiting to call a "Code Blue" for assistance until after Williams used his mace.  Doc. 1 at 5, 11; Doc. 32 at 2–3.  Peterson avers that Williams violated his Eighth Amendment rights by using mace only after Peterson already had been assaulted twice.  Doc. 1 at 5, 11; Doc. 32 at 3.  Peterson avers that, had Defendants intervened sooner, he would not have been injured.  Doc. 1 at 6, 11; Doc. 32 at 2.

Prison officials can be held liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence.  *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998).  Prison officials who witness an inmate-on-inmate assault are generally obligated "to take reasonable steps to protect the victim."  *Ledlow v. Givens*, 500 F. App'x 910, 914 (11th Cir. 2012) (citing *Skrtich*

---

[9] Because Peterson cannot show a constitutional violation for failure to protect, both Brooks and Williams are entitled to qualified immunity on this claim.  *See Waldron*, 954 F.3d at 1304.  In this regard, the parties do not dispute that Defendants were acting within their discretionary authority during the relevant time period.  *See Kesinger*, 381 F.3d at 1248.

*v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002)); *see also Farmer*, 511 U.S. at 833 (reasoning that, having taken from inmates "virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course").

A plaintiff asserting a claim for failure to intervene must demonstrate that the defendant was in a position to intervene but failed to do so. *See, e.g.*, *Alston v. Swarbrick*, 954 F.3d 1312, 1321 (11th Cir. 2020) (citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1330–31 (11th Cir. 2008)). Like a claim for failure to protect under the Eighth Amendment, a claim for failure to intervene requires a showing of a defendant's deliberate indifference to a substantial risk of serious harm. *See Murphy v. Turpin*, 159 F. App'x 945, 948 (11th Cir. 2005) (discussing the application of the deliberate indifference standard to a failure to intervene claim).

Here, Peterson avers that—after he was attacked—neither Brooks nor Williams acted immediately to stop the fight. While both Brooks and Williams dispute Peterson's side of the story, Defendants' own averments create nothing more than a factual "he said/she said/he said" dispute.[10] Williams avers that he ordered

---

[10] As noted above, Peterson states that video footage of the incident supports his version of the facts. But no video footage has been submitted to the court, and so the undersigned cannot rely on that video in this report. *See generally Singletary v. Vargas*, 804 F.3d 1174, 1183 (11th Cir. 2015) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007), for the proposition that, "where videotape footage clearly contradicted the non-movant's testimony, the district court should not have relied on the non-movant's testimony in resolving summary judgment motion on an excessive force

the inmates to stop fighting and that, when they did not, he used his mace.  Doc. 29-3 at 1.  Brooks avers that she told the inmates to stop bickering, ordered them to stop fighting, and called a "Code Blue" for assistance.  Doc. 29-2 at 3.

But Peterson avers that neither Brooks nor Williams took any action—including even ordering the inmates to stop fighting—until Williams used his mace to stop a third assault, and that only then did Brooks call a "Code Blue" for assistance.  *See* Doc. 32 at 4–5, 11, 15.  And Peterson avers that Brooks later stated that she did not stop the assault because she wanted to see Peterson "get [his] a[**] beat."  Doc. 1 at 5; Doc. 14 at 1; Doc. 32 at 11.

While the duration of the alleged assaults is unclear, Peterson avers that the incident is shown on video from 9:20 AM to 10:00 AM—a timespan of 40 minutes.  Doc. 32 at 11.  Defendants do not dispute that averment.

Thus, construing the evidence and reasonable inferences in Peterson's favor, Brooks and Williams did not timely intervene to stop the alleged inmate assaults, stood by for up to 40 minutes, and failed to take reasonable steps to help Peterson as he was assaulted at least twice by other inmates.  *See Ledlow*, 500 F. App'x at 914.  On the record evidence, a jury could find that Brooks and Williams were deliberately indifferent to a substantial risk of serious harm because they knew that Peterson was being assaulted by other inmates, but failed to take timely action, and consequently

_____

claim").

did not respond to the inmate assaults in a reasonable manner. *See Mosley*, 966 F.3d at 1270–71; *see also Murphy*, 159 F. App'x at 948. Accordingly, there is a genuine dispute of material fact for a jury on Peterson's claim for failure to intervene. *See Velazquez v. City of Hialeah*, 484 F.3d 1340, 1342 (11th Cir. 2007) (holding that the prisoner's and the prison guards' contradictory stories presented an issue of fact for a jury); *see also Woodyard v. Alabama Dep't of Corr.*, 700 F. App'x 927, 933–34 (11th Cir. 2017) (discussing what a reasonable jury could believe based on the facts presented to the court at summary judgment).

Moreover, on the record evidence, Brooks and Williams are not entitled to qualified immunity on Peterson's claim for failure to intervene. As with Peterson's failure to protect claim, there is no dispute that the defendants were acting within their discretionary authority. *See Kesinger*, 381 F.3d at 1248. But (as explained above), a reasonable jury could find that Brooks and Williams violated Peterson's Eighth Amendment rights on his failure to intervene claim. *See Marbury*, 936 F.3d at 1232.

In addition (on the record facts), the right at issue—the right to be "protected from violence at the hands of other prisoners"—is a clearly established constitutional right of which any reasonable corrections officer would have known. *See Farmer*, 511 U.S. at 833. Reviewing the record facts in the light most favorable to Peterson, Brooks and Williams had witnessed several inmates assault Peterson at least twice—

23

over a time period of as many as 40 minutes—without taking action to stop the assaults. *See, e.g.*, *Anderson*, 483 U.S. at 641 (analysis "require[s] examination of the information possessed by" the defendants at the relevant time).

The Eleventh Circuit has stated that, because it is clearly established that prison officials must take reasonable measures to protect inmates, a "reasonable officer should have known that he could not, in keeping with that standard, delay for five minutes taking any action while one inmate assaulted another one." *Woodyard*, 700 F. App'x at 934. Likewise, in this case, a reasonable officer who had witnessed inmates assault Peterson twice would know that he had a duty to protect Peterson from harm and could not stand by without intervening.

As such, Defendants had "fair warning" that a failure to timely intervene during such an inmate assault—as Peterson alleges here—is unconstitutional. *See Piazza*, 923 F.3d at 955. Thus (on this summary judgment motion), the record facts suffice to overcome qualified immunity on Peterson's claim for failure to intervene. *See Marbury*, 936 F.3d at 1232.

### RECOMMENDATION

For the reasons stated above, the court should grant in part and deny in part Defendants' summary judgment motion (Doc. 29).

The undersigned **RECOMMENDS** that the court **GRANT** Defendants' summary judgment motion on Plaintiff Peterson's failure to protect claim.

24

The undersigned further **RECOMMENDS** that the court **DENY** Defendants' summary judgment motion on Peterson's failure to intervene claim.

## NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation.  Any objections must be filed with the Clerk of Court within **14 days**.  The objecting party must identify every objectionable finding of fact or recommendation and state the specific basis for every objection.  The objecting party also must identify every claim in the complaint that the report and recommendation has not addressed.  Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

A party who fails to object to factual or legal conclusions in the Magistrate Judge's report and recommendation waives the right to challenge on appeal those same conclusions adopted in the District Judge's order.  Without a proper objection, however, the court on appeal may review the unobjected-to factual and legal conclusions for plain error if necessary in the interests of justice. 11th Cir. R. 3-1.

After receiving the objections, a District Judge will conduct a *de novo* review of the relevant portions of the report and recommendation and may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings of fact and recommendations.  The District Judge also may refer this action back to the Magistrate Judge with instructions for further proceedings.

A party may not appeal the Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. A party may appeal only from a final judgment entered by a District Judge.

**DONE** this January 10, 2023.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE